**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TH:DJM/MND
F. #2026R00563

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 28, 2026

By ECF

The Honorable James R. Cho
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Jabari Cummings
Docket No. 26-CR-297 (JMA)

Dear Judge Cho:

The government respectfully submits this letter in support of its application for the entry of an order of detention pending trial as to the defendant Jabari Cummings, who has been charged with being a felon in possession of a firearm and ammunition. Cummings is a member of the Folk Nation Gangster Disciples ("GD"), a violent street gang based in Brooklyn, New York. For the reasons explained below, including the defendant's affiliation with GD and criminal history, the defendant is both a flight risk and a danger to the community, and no combination of conditions can secure his appearance at trial and the safety of the community.

## I. The Defendant's Crimes

### A. Background

The government proffers the following facts concerning the offense conduct that is relevant to the defendant in this case. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (holding that the government may proceed by proffer in a detention hearing); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

GD has been a significant contributor to gun violence in Brooklyn for more than a decade, committing dozens of shootings, particularly drive-by shootings, in rival gang neighborhoods such as Canarsie, Brownsville and Prospect Park South. GD operates in Brooklyn through several neighborhood-based subgroups, or "sets," including the "Six Trey" set (also known as "63" or "6-Trey"), which is based primarily in the vicinity of the Ebbets Field housing complex near the Crown Heights neighborhood of Brooklyn.

Members and associates of GD have committed acts of violence on behalf of the gang, such as shootings and other acts involving murder and assault, drug trafficking and fraud, among other crimes. In GD, participation in criminal activity by a member, especially violence directed at rival gang members, increases the respect accorded to the member and could result in promotion to a leadership position. Threats of violence often become acts of violence with members and associates engaging in "drills" in which they drive, often in a convoy of several cars, to rival gang territory in Brooklyn and indiscriminately shoot at groups of young people. Moreover, the gang glorifies gun violence including through its use of social media, in which members and associates post content and videos showing them with firearms, pantomiming firearms, and antagonizing rivals through online taunts and threats.[1]

B. The Instant Offense

On September 19, 2025, at approximately 6:00 a.m., law enforcement officers executed a warrant to search a second-floor apartment at 1720 Bedford Avenue, Brooklyn, New York 11225 (the "Apartment"). Law enforcement officers executed the warrant to locate and arrest the defendant's brother, Haile Cummings, who was involved in a violent shooting that occurred at Taste of the City Lounge in Brooklyn, New York on August 17, 2025 (the "August 17 Shooting"). See United States v. Cummings, et al., 25-MJ-262 (CHK). As a result of the August 17 Shooting, in which members and associates of GD and a rival gang, the 5-9 Brims, fired over forty shots in a crowded bar, three individuals were murdered and an additional ten individuals were shot and injured.

At approximately the same time that law enforcement officers knocked on the front door of the Apartment, additional law enforcement officers located outside of the apartment building observed someone throw items out of one of the Apartment's windows. The relevant window is labeled "D" in the image below, which is a still image taken from an officer's body-

---

[1] Numerous members and associates of GD have been convicted of or charged with serious violent crimes in this District over the last several years. See, e.g., United States v. Waddell, et al., No. 24-CR-351 (S-2) (LDH) (multiple GD members and leaders charged with racketeering offenses, including murder and a gang-related drive-by-shooting on Father's Day in 2022); United States v. Britton, No. 23-CR-406 (LDH) (GD leader charged with false statements and obstruction); United States v. Zeigler, No. 23-CR-114 (MKB) (GD member charged with firearm possession in connection with a shooting); United States v. Apollon, No. 21-CR-636 (DG) (GD member charged with robbery of vehicles from parking garage where parking attendant was permanently injured); United States v. Cummings, No. 21-CR-406 (CBA) (GD associate charged with possessing multiple firearms on multiple separate occasions); United States v. Powell, No. 21-CR-205 (LDH) (GD member charged with firearm possession in connection with a shooting); United States v. Agoro, No. 21-CR-166 (WFK) (relating to a March 14, 2021 use of threatened use of force in furtherance of a plan to commit extortion); United States v. Brown, No. 20-CR-293 (WFK) (eleven GD defendants charged with racketeering offenses for seven gang-related shootings in 2020).

worn camera footage during the execution of the search warrant.




Law enforcement officers recovered the items that were thrown from the window and discovered the items were two firearms.

Law enforcement officers executing the search warrant determined that only the defendant and his mother were inside the Apartment. Law enforcement officers further determined that the firearms had been thrown from a bedroom within the Apartment. Within the bedroom from which the firearms were thrown, officers found, among other things, a United States passport in the name of "Jabari Cummings" and an earnings statement in the name of "Jabari Cummings." The bedroom also had paraphernalia associated with GD, including photographs of the defendant with GD members and associates.

The firearms thrown from the window were later identified as a Springfield Armory 9mm caliber semi-automatic pistol with serial number HM911484 (the "Springfield Armory") and a Taurus USA .380 caliber semi-automatic pistol with serial number 1F024183 (the "Taurus"). The Springfield Armory was loaded with 11 rounds of ammunition, and the Taurus was loaded with six rounds of ammunition. Moreover, according to a March 2026 report from the New York City Office of Chief Medical Examiner's Department of Forensic Biology ("OCME"), the DNA profile developed from an abandonment sample for the defendant submitted in connection with his arrest in 2013 is included as a contributor to the DNA mixture on the swab from the side grips of the Taurus thrown from the Apartment.

In addition, a review of the National Integrated Ballistic Information Network ("NIBIN") further showed that shell casings recovered from four separate shootings were each

fired from the Springfield Armory recovered in this case. Notably, one of the shootings occurred on August 30, 2025 in Brooklyn, New York, which was two weeks after the August 17 Shooting. The victim of this shooting was a known member of the 5-9 Brims. Given the defendant's association with GD, law enforcement is investigating whether this August 30, 2025 shooting was committed by GD members or associates in retaliation for the August 17 Shooting.

C. The Defendant's Membership in and Association with GD

The defendant, also known as "Doc," is a known member of GD. As noted above, the Apartment contained multiple pieces of paraphernalia associated with GD in a room identified as the defendant's room, including photographs of members and associates of GD. The room also included a DVD referencing "Larry Hoover," who was one of the founders of the Gangster Disciples.

The defendant has also been depicted on social media as a member of GD. For instance, on March 25, 2021, a Facebook account with the vanity name "Izzauddyn Muhammad" posted a picture that stated, "Happy G day to the bro DOC" and "FREE THAT MAN [balloon emoji]." The defendant is depicted in the bottom right-hand side of the below picture (circled in red). The reference to "G day" is how members and associates of GD wish each other a "Happy Birthday." Moreover, the date of this post—March 25—is listed as the date of the defendant's birthday in law enforcement records.



As seen above, a second Facebook account shared this same picture of the defendant with the caption "Free the Gz" on March 25, 2022. At this time—March 25, 2022—the defendant was incarcerated in connection with a state conviction in New Jersey, which is described below. Moreover, members of GD frequently signify their membership through references to subgroups within or associated with GD, including "No Love City," "74," "6-Trey," and "Stay Paid Money Burners," or by appending the words "Gz," among others, to their nicknames. Thus, the caption "Free the Gz" is a reference to the Facebook user's desire to free the defendant from incarceration and connecting him to GD.

## II. The Defendant's Criminal History and Additional Relevant Information

This is not the defendant's first instance of firearms possession. On November 25, 2014, the defendant was convicted of criminal possession of a weapon in the fourth degree: firearm/weapon, a misdemeanor, in violation of N.Y.P.L. § 265.01(1). He was sentenced on January 8, 2015 to a conditional discharge.

The defendant was then arrested for committing a violent stabbing in New Jersey inside a casino in Atlantic City, New Jersey in July 2020. On October 28, 2021, the defendant was convicted of aggravated assault in the second degree, a felony, in violation of New Jersey Code of Criminal Justice § 2C:12-1(b)(1). He was sentenced on December 2, 2021 to three years' incarceration.

And last month, on September 7, 2026, the defendant was arrested in Brooklyn, New York. Based on a report from the New York City Police Department ("NYPD"), while NYPD officers were effecting an arrest, the defendant pushed a police officer with his chest multiple times. He then took a fighting stance and balled both hands into a fist directed at the officer. After being placed under arrest, NYPD officers recovered a lever-assisted knife from the defendant's waistband. The defendant's case is currently pending in Kings Criminal Court.

## III. Legal Standard

The court "shall order" a defendant detained if it finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The government bears the burden of persuading the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).

As noted above, the government may proceed by proffer to establish facts relevant to a detention determination. Ferranti, 66 F.3d at 541. Furthermore, "[t]he rules of evidence do not apply in a detention hearing." Id. at 542. As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly

> in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, "including whether the offense is a crime of violence . . . or involves a . . . firearm"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including "whether, at the time of the current offense or arrest, the person was on probation [or] on parole"; and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g). Specifically, in evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

## IV. Argument

### A. The Defendant is Eligible for Detention Under Section 3142(f)

The defendant is charged with a violation of 18 U.S.C. § 922(g), which the Second Circuit has held is a "crime of violence" for purposes of 18 U.S.C. § 3142(f)(1)(A). See United States v. Watkins, 940 F.3d 152, 163 (2d Cir. 2019) ("It has long been the law of our Circuit that possession of a firearm is unequivocally a crime of violence for purposes of § 3142(f)(1)(A). Our Court's reasoning in arriving at this conclusion applies with equal force to the crime of possession of ammunition by a convicted felon.").

### B. Detention is Warranted

No bail package can protect the community from the danger posed by the defendant or mitigate the risk that he will flee. Each of the four factors set forth in Section 3142(g) militate in favor of his pretrial detention.

First, the defendant is charged with a crime of violence that "involves a . . . firearm." 18 U.S.C. § 3142(g)(1). Given the grave risk posed by the use of firearms—especially in a densely populated environment like New York City—courts regularly order detention in cases involving gun offenses. See, e.g., United States v. Edwards, No. 21-M-231 (WFK), 2021 WL 796089, at *3 (E.D.N.Y. Mar. 2, 2021) (recognizing the use and a possession of a firearm demonstrates dangerousness); United States v. Williams, No. 20-CR-293-2, 2020 WL 4719982, at *3 (E.D.N.Y. Aug. 13, 2020) ("[T]he danger of Defendant's release is demonstrated through the fact [that] Defendant's instant and past offense involved the use of a firearm"); United States v. Harris, No. 19-CR-300 (VSB), 2020 WL 4014901, at *7 (S.D.N.Y. July 16, 2020) ("Defendant's arrest for being a felon in possession itself raises the specter of danger to the community."); United States v. Smalls, No. 20-CR-126, 2020 WL 1866034, at *1 (S.D.N.Y.

Apr. 14, 2020) (affirming a magistrate judge's order of detention that was based, in part, on "the general danger to the community posed by [the defendant's] apparently ready access to firearms"); see also United States v. Lyons, 675 F. App'x 28, 30 (2d Cir. 2017) ("The district judge indicated that felons in possession of firearms are a danger to society—the comment does not reflect an improper bias against firearms. To the contrary, it is an opinion shared by Congress, which criminalized such conduct").

Second, the weight of the evidence against the defendant is overwhelming. See United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022) (where the evidence of a defendant's guilt is strong, "it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment) and therefore may present an elevated risk of flight"). As described above, law enforcement officers recovered two firearms thrown from the window of the Apartment where the defendant was residing with his mother. The incident is captured on body-worn camera footage. The gun has also been tested for DNA. OCME reports show that a DNA profile developed from an abandonment sample for the defendant from 2013 is included as a contributor to the DNA mixture on the Taurus thrown from the Apartment.

Based on the charges in the Indictment alone, the defendant currently faces a significant maximum sentence: 15 years' incarceration. The likelihood of a lengthy term of imprisonment for the defendant (who is facing a Guidelines range of 57 to 71 months' imprisonment) gives him a strong incentive to flee and greatly minimizes any risk that pre-trial detention would result in an over-served sentence. See Williams, 2020 WL 4719982, at *2 (Guidelines range of "92 to 115 months' imprisonment" gave defendant "a strong incentive to flee"); United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long a defendant has stronger motives to flee.").

Third, the defendant's history and characteristics weigh heavily in favor of detention. As noted above, the defendant was convicted of a firearms-related charge in 2014 and a violent stabbing in 2021. The defendant's actions since the time of his previous detention show that he was not deterred from his previous conviction, given his access to and possession of firearms. Moreover, his September 2026 arrest in which he pushed an NYPD officer and was found in possession of a lever-assisted knife demonstrates that the defendant poses an unacceptable risk to the community.

Fourth, the risk of further violence and flight by the defendant is severe. Courts have consistently held that where a defendant is associated with a violent criminal organization, such as GD, no conditions—even stringent conditions of home confinement—are sufficient to protect the community. See United States v. Irizzary, No. 17-CR-283 (LAP), 2020 WL 1705424, at *3 (S.D.N.Y. Apr. 8, 2020) ("Even under normal conditions, electronic monitoring does not suffice to restrain violent criminals who, like [the defendant], are members of organized gangs."); United States v. Choudhry, 941 F. Supp. 2d 347, 359 (E.D.N.Y. 2013) ("It is well established that home detention and electronic monitoring may be insufficient to protect the community against dangerous individuals, particularly where those individuals have the ability to command others to do their bidding."); United States v. Gotti, 219 F. Supp. 2d 296, 299 (E.D.N.Y.) ("In circumstances where the government has demonstrated that a defendant is a leader of an organized crime family, the Second Circuit has uniformly held that the defendant is

dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any condition or combination of conditions of release."), aff'd sub nom. United States v. Ciccone, 312 F.3d 535 (2d Cir. 2002).[2] The defendant has not been deterred by his prior custodial term as clearly demonstrated by his decision to obtain two firearms, one of which is connected to a shooting from August 30, 2025. This incident is currently being investigated as a retaliatory shooting for the August 17, 2025 Shooting. And the fact that he threw the firearms out of the window when law enforcement arrived at the Apartment further establishes that he knew his possession of these firearms was illegal.

The § 3142(g) factors each compel detention in this case, demonstrating that the defendant cannot be released without risking the safety of the community and the likelihood that he will not return to court as required. The defendant should therefore be detained.

## V. Conclusion

For the reasons set forth above, the government respectfully submits that no condition or combination of conditions will properly assure the safety of the community or the defendant's return to court if the defendant is released on bail, and therefore requests that the Court order that the defendant be detained.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/ Daniel J. Marcus
Daniel J. Marcus
Molly N. Delaney
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of the Court (JMA) (JRC) (by ECF)
Counsel of Record (by ECF)

---

[2] See also United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology"); accord United States v. Brennerman, 705 F. App'x 13, 16 (2d Cir. 2017); United States v. Dono, 275 F. App'x 35, 37 (2d Cir. 2008); United States v. Kelly, No. 19-CR-286 (AMD), 2020 WL 2528922, at *3 (E.D.N.Y. May 15, 2020) ("Nor are the defendant's proposed measures—that he be kept on home confinement and monitored by pretrial services—sufficient to eliminate the danger to the community.").